The last case on the calendar for today is number 20-4275 United States v. Ramos Good morning, Your Honors. My name is Herbert Grieman. I represent the appellant, Gregory Ramos. If I may have a second. Your Honors, if I may just start by saying something that I felt throughout this case, and that is, as a longtime criminal defense attorney, it's always difficult to come before a court and argue that a colleague's performance was less than sufficient, in fact, was deficient. But in this case, we believe that it was. The case began, Your Honors, the trial began with opening statements, with counsel calling his client, Mr. Ramos, a hustler, told the jury that he was the person who the police didn't like and he caused all kinds of problems for the police. And then the case went from there. The case basically was about whether any drugs that were possessed by Mr. Ramos were possessed with the intent to distribute, because that's what not only triggered the conviction for the possession with the intent to distribute, but it also triggered the five-year mandatory minimum on the 924C charge. Counsel throughout the trial asked virtually no questions except for one witness, and that was Task Force Agent Higgins. The government called probably 20-plus witnesses during the trial, and I believe that aside from Agent Higgins' cross-examination, the longest cross-examination was maybe a couple of pages long. And that may not be the test. Can I just jump in for a moment? With regard to what you're saying are these deficiencies in the trial, certainly something the decision to cross-examine or not, I mean, there are and can be strategic reasons for that. And so I'm looking for what you're pointing to that's deficient conduct that does not seem to be a strategic choice of counsel. Your Honor, I can give you two examples from just beginning when he cross-examined Agent Higgins. One of the questions was he tried to challenge Agent Higgins about a box and a scale that was inside this box that was found inside the car. He clearly had never looked at the box. As a matter of fact, the government only put in a picture and not the box itself. And he tried to create an impression that the box was never used and that the scale was never used, that it was a new box. That's what he suggested. And again, it's clear he had never looked at the box. Well, during a recess, the government went back and looked at the box and found that not only was it a used box, but they found a residue of what they claimed was cocaine on the scale itself. Your Honor, I don't think that there's any way you can look at that and say that that was a tactical, a good tactical approach to the case. For example, he was told prior to trial that the government had finally looked at a Facebook, some Facebook pages of the defendant from a tablet. And the government said we're not going to use it because it won't be fair to the defendant because we just got it and we lost the Facebook, what came up on the tablet. So we're not going to use it unless the defense brings it up and mentions it. And counsel was warned by the judge, don't open the door to this. Don't open the door. Well, he did. And he started asking questions about it, trying to suggest that there was nothing on the tablet. On redirect examination, the witness was allowed. And Judge Velardo told counsel, I told you not to open the door, that you can't do it. And you did do it. And, again, Your Honor, those are maybe only two examples, but we mentioned, I think, 19 areas. But those were only two areas where I don't know how anyone could look at that. You know, if I'm drawing from my own experience, and I have, unfortunately, many years of experience, I can't see how anybody could suggest that that was good, a reasonable tactical decision. Okay. So let me pull you into the next part of that, assuming that that is, in fact, a mistake, deficient performance in some way. What's the argument in support of that this was prejudicial enough to warrant reversal here? Well, Your Honor, I think that the issues were perhaps in some way unpreparedness and in some ways deficient performance at the trial. The issue in the cases I indicated was whether, in fact, whatever drugs were possessed were possessed with the intent to distribute. The government could only produce, well, approximately a half a gram of drugs. And that's all that they had. But they also had 200 bottles. They had 200 bottles, and they had a stash of cash, 3,000-and-some-odd dollars, which the government argues was consistent with distribution. Your Honor, it's interesting that you ask that because what happened in that case, counsel did not object to the introduction of the cash and really did not try to explain a legitimate source of that cash. Well, what wound up happening is prior to sentencing, the pre-sentence report suggested that that cash, because it was drug money, should be converted into drugs, into an amount of drugs. And after objections were made and information was provided to the judge, the judge made a finding and a decision in order that there was no proof to show that that money came from drugs. As a matter of fact, there was proof that the money came from a legitimate source that he had gotten from his girlfriend. His girlfriend gave it to him. And that's what Judge Valado found. Judge Valado refused to make the conversion from the money into the drugs because he found that there was other reasonable explanations for it. And in his affidavit, Mr. Ramos said, I wanted to testify. And that was one of the things he wanted to testify about. And that led to another problem, Judge Parker, because what winds up happening, and it's sad, but counsel passed away shortly after the trial, Mr. Ramos filed an affidavit saying, I wanted to testify, and I had a right to. And at the trial, the court did not inquire of him of his right to testify or his right not to testify. But he said, I wanted to testify, and he listed a litany of reasons what he wanted to testify about. The court found that, and the law is that traditionally when an individual makes a motion saying, I wanted to testify, there should be some corroboration. And Judge Valado said, well, the problem here is that counsel passed away, so you don't have any corroboration. With all due respect, he held it against the defendant that his attorney had passed away, and therefore he couldn't corroborate it. It was impossible. Normally it would be easy to corroborate it. You put the lawyer on the stand and he says, I told him he couldn't or he never asked me. But that's not what happened here. We've been talking about the drug charges, but can you explain how these deficiencies impacted the gun charges and how you would have gotten a different result on the gun charges if something happened that didn't happen? Your Honor, it may not have made a difference in terms of the gun charge. As a matter of fact, counsel at trial never really argued anything about the possession of the gun. There was DNA found on the gun. He didn't cross-examine the expert, unfortunately, but he didn't go into that area, so there was really nothing to controvert it. But where the gun, where the proof, and what the government was trying to show throughout this trial and what counsel failed to do and what he really didn't address properly was the issue of whether the gun was possessed in relation to a drug trafficking crime. It was thrown out of a car where there was a stash of cash, there was a trace of cocaine, and there were 200 lines. That's it. Right? That's it, Your Honor. And that's the sum total of the proof. The question is, was a half a gram that they found,  because they picked some things up and it was found when it was tested. I don't know if each speckle was tested. You know better than I do, but if you look at the photographs, it looked like somebody was trying to throw cocaine out of a window, right? That's correct, Your Honor. And it's still on the side of the car. That's correct, Your Honor. But the question really comes down to, and if the government thought that that was sufficient, that's all they had to show. But they went way beyond that, Your Honor, way beyond that, because what their whole intent to do was to try to show that he was a drug dealer. That's what they tried to show. That's why they called, well, Higgins was a fact witness who was allowed to give expert testimony, which we claim was inappropriate, but that's the sum total of the reason why Agent McHugh testified as an expert witness under 702, and his entire testimony was geared to try to show that everything, as it showed in this case, showed that he was a drug dealer. McHugh was not cross-examined at all. Not one question was asked of him, Your Honor. Nothing. You know, you get to a point in a case like this, and you look at it, and you try to suggest, as Judge Lee questioned me, can you really say that this man received a fair trial? And, Your Honor, I think if we look at the test, that in order to show that counsel's performance was deficient, there has to be a reasonable probability of a different result, which is only a probability sufficient to undermine the confidence of the outcome. It does not require certainty that the results would have been different. That's a standard which we believe the court should enlist, and that's a standard that this court has suggested in the past. It exists in ineffective assistance of counsel cases. This case went way beyond a very simple case. It became a complicated case. What's the innocent explanation for the 200 vials? I'm sorry, Your Honor? What is the innocent explanation for the 200 vials? The vials, Your Honor? The vials actually, Judge, Judge, the vials. Yeah, the vials that were found, the empty vials that were found in the care. Judge Villardo made a finding in a separate proceeding that those vials probably were not even vials that somebody would put cocaine in, that they can be used for other sources. And again, Your Honor, that sort of started to be redundant, but that kicks right back to Ramos' request to testify of his counsel because he wanted to explain where those vials came from, and he wanted to explain that they had a legitimate source. Whether a jury would buy it or not, that would remain to be seen. But the bottom line is, Your Honor, he should have had the opportunity for that explanation to testify. Thank you, Mr. Griffin. We'll hear from the government. May it please the court, Monica Richards, representing the United States on this appeal. What we had here in this case was a case with lots of evidence, to say it one way. The evidence was the drugs, the vials, the cash, the gun, and the evidence was that there was no evidence and all of the actions of the defendant. So the evasive actions that were taken, the phone call to 911, trying to distance himself from the car, tossing the drugs and the loaded gun from the vehicle while it was going at a high speed. All of that evidence here was presented to the jury, and the jury made its finding of guilt with regards to count two, three, and four. As has been noted, with regard to count four, there's really no argument that could be made. He was a person who was not supposed to have a gun, and he had a gun. He admitted to having the gun, even in post-argument papers that were filed. With regard to count two, the drug trafficking, as Your Honors noted, there was evidence that this was somebody who was trafficking drugs. Just the physical evidence was the vials and the drugs themselves. We did have an eyewitness to a white bag having been thrown out of the car that was corroborated or substantiated by the fact that there was some deep powder. I'm sorry? Was it recovered? The baggie was recovered, yes. That was thrown out of the car? Yes. Can I just back up on that? It's not perfectly clear that it was the baggie. It was a baggie that was located in the area where the chase had occurred. There was no DNA evidence on it. We don't know for sure that it was that baggie. And what did it contain? There was residue that did not test positive for cocaine. But the inside of the car, we had the witness who testified that he saw the bag being thrown out, that it bounced from his hood to his windshield, and then based on the fact that there was the cocaine within the vehicle, as Your Honor Judge Carkers noted, that the story was, I keep saying corroborated, I'm not sure if that's right, the story fit. So what do we do with that fact, that there's a bag that was not positive for drugs? We don't do anything with that fact. We don't need to. That fact is just the fact that they looked in the area, they pursued it, they pursued the location. It could have been anybody's bag. It could have been that bag, and maybe all the cocaine had indeed dispersed to the inside of the car and to the winds, so there was nothing left in it, or it was the wrong bag. Was it that there was not enough to do a test that would determine what it was, or was it determined not to be cocaine? That is a good question. I'm not prepared to answer that. I believe it tested. All I know is it was tested and there was no evidence. I can't say more specifically. I'm sorry. I could look that up if the court needs a post-argument answer on that as well. But suffice to say anyway that that bag or not bag, whether or not that bag was related to this particular incident, isn't what matters here. What matters is all the other evidence that was overwhelmingly sufficient of guilt. We didn't need that bag to present the case to the jury or for the jury's verdict to stand. With regard to the questions that arose then between sufficient evidence as to the gun being connected to the drug trafficking, again, here, given the context, given where it was found, that it was in a vehicle that had all of the defendant's possessions, or most of the defendant's possessions, that it was in the presence of the drugs, the empty vials, and the cash, that is something that this court on numerous occasions has found to be sufficient to find that the drug was possessed in furtherance of drug trafficking. I'm not sure that I missed any of the other questions that were raised by the court of my opponent unless there's any further questions addressed on my brief. Actually, if you could, could you speak a little bit to the question of ineffective assistance? Oh, I'm sorry. I'm sorry. Yes. The ineffective assistance of counsel, I mean, here that is indeed something that was addressed by the district court. New counsel, current appellate counsel was present and made motions with regard to that, and the district court reviewed every argument that was presented and found that the, as Your Honor, Judge Lee, as you noted, that the questions really went to matters of trial strategy. So the two things that I note that my opponent raised in speaking to the court were the cross-examination of Agent Higgins and the Facebook tablet. Again, with regard to this case where the evidence was so overwhelmingly sufficient, there was such abundant evidence, that wouldn't matter. You couldn't say that the decision regarding the scale and to look at that scale and see whether or not there was residue on it opened the box. You can't say that the residue that was on the scale was the thing that, I don't want to say tipped the scale,  but that wasn't what drove this verdict. And similarly with regard to the notes and the information that was on the Facebook tablet, that was really limited evidence. That was limited to a discussion of something that the agent saw in a quick, turned it on, turned on the Facebook, saw something, and then it was turned off or it powered off and they weren't able to preserve it because they didn't have the password. But that was really a blip in the overall scope of the testimony that was presented here. So to say that either of those two things drove this verdict isn't fair or reasonable or something upon which this court should overturn the verdict. Again, what's here, the question my colleague was pressed as to what was so prejudicial. And here, given the acquittal, frankly, on count one, it's very, very difficult to say that this was somebody who was ineffective. The evidence was very similar on count one. The defense counsel achieved a verdict of an acquittal, rather, on count one. So that really undermines the presentation here of prejudice. If there's something more specific I could address, I'd be happy to. Remind me, please, of the nature of the extent of the judge's inquiry into ineffective assistance. I take it Ramos didn't testify on that. But what happened? Was there a hearing? Was there argument of counsel? Was it both? What happened? There was a lot of papers. There was a lot of papers that were submitted and there was argument. The papers are all included in the appendices that have been submitted to the court. I could give you the specific references, but there were papers that were filed and then there were more papers that were filed and more papers. There were four sets of papers that went back and forth on that. Only ineffective assistance. Yes. And then the judge heard argument on it and rendered its decision. With regard, if Your Honor is asking, I did just now think about the issue about the money, if that's what the concept of whether or not there was a reasonable explanation or a legitimate explanation for the cash that was found in the car that was presented during the trial to the jury and the jury may or may not have considered the cash. We don't know. We just know that in sum it found the evidence sufficient. The finding that was made later by the sentencing court, by the same district court, but at sentencing was that it may or may not have been. He listened to the reasons that were then presented for why it was legitimate and found that it wasn't. But other than it had the bottles and the trace of cocaine. Correct. There were other things. There were plenty of other things. That what? The gun? And what else? The conduct. There was this physical evidence here, Your Honors, but there was also the conduct. He may have been doing something bad, but that's not the issue. The issue was, was the bad something he was doing, possessing drugs with intent to strip? Well, that's what he threw. He threw the gun. He threw the drugs. He threw the things that were in his immediate vicinity. He couldn't throw the vials. They were back in the trunk. He did abandon the car then. Then he tried to distance himself from the car, from those vials, from the scale. He tried to distance himself by calling 911 and reporting the car as stolen and then jumping out of the car on the side of the road instead of the thruway and leaving it. So he definitely tried to avoid those things, being associated with them.  I would rest. Thank you. Thank you, counsel. Mr. Greenman, you have about two minutes for a vote. Judge Parker, what happened was Mr. Ramos filed an affidavit indicating that he wished to testify in the circumstances and about . . . This is though after trial counsel had died. That's correct, Your Honor. And remind me at what point you came into the case. Good question. I was appointed after Mr. Heumann had passed away, obviously. Okay. It was not too long after he had passed away. The case had sort of lingered for a short while, obviously, because . . . The jury, the verdict was in by then. He was convicted already. That's correct, Your Honor. Okay. And then I was asked to come. Judge Villardo's chambers asked me to come and take over the case. So was there any evidence of ineffective assistance of counsel that you didn't have an opportunity to present at that time? No. I think, Your Honor, all of it was pretty much brought up at that time. There were a couple of issues that are maybe in the brief that are discussed maybe a little bit more at length. But I think . . . I know that Ms. Richards has raised the issue that maybe this isn't right. Maybe it's more ripe for 2255. I think it's ripe right now. I think you have everything. I think whatever happened at the trial or didn't happen at the trial is before you. And so we've asked the court to consider this right now. One last comment. The government claims that everything that Mr. Heumann did was tactical. The beginning of the case in the opening statement, counsel made the statement that the truth would come out through cross-examination in this case. That's what he told the jury. And he cross-examined really one witness. And when that cross-examination took place, what happened was disastrous for him because he raised two issues which wound up coming back and, unfortunately, were detrimental to the defense. They were not helpful to the defense at all. So when you open up and you start your opening statement and you say to the jury, everything and the truth is going to come out during cross-examination, and then you don't cross. And then you have Agent McHugh testifying. And it was devastating testimony, but it was really ripe for cross-examination. A lawyer like Mr. Heumann would have known how to do that, but he didn't do it in this case. I can't answer why. Judge Parker, I wish I knew what happened here. And it's a shame. And it's a shame that I have to even be up here talking about a colleague who has passed away. And it hurts. It really does. But if you look at the record in this case, in totality, you know, what do you have? You have a case of cross-examining one witness and nobody else. And when you do cross-examine, you get yourself in trouble. And not really investigating and not really finding out and learning what the truth was with respect to some of the ancillary proof in this case that you brought up, Your Honor. That's all I have. Thank you very much, Your Honor. Thank you both. Thank you, Counselor. We'll take the case under advisement.